IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| **ADAM GENE JOHNSON,** | ) | **Case No. 11 C 50278** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Hon. P. Michael Mahoney** |
| **v.** | ) | **U.S. Magistrate Judge** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.     Introduction

Adam Gene Johnson ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before

the Magistrate Judge pursuant to the consent of both parties. *See* 28 U.S.C. § 636(c); Fed. R. Civ.

P. 73.

### II.     Administrative Proceedings

Claimant filed for Supplemental Security Income ("SSI") benefits on February 29, 2008,

alleging an onset of his disability as of his date of birth, September 8, 1989. (Tr. 113.) Claimant's

initial claim was denied on June 18, 2008. (Tr. 59-62.) His claim was denied a second time upon

reconsideration on September 8, 2008. (Tr. 67-69.) Claimant then filed a timely request for a

hearing before an Administrative Law Judge ("ALJ") on October 31, 2008. (Tr. 71.)  That

hearing was held before ALJ Cynthia Bretthauer on August 27, 2009. (Tr 18-45.) The ALJ then

denied the Claimant's application in a written decision dated September 21, 2009. (Tr. 51-58.)

Subsequently, the Appeals Council denied Claimant's request for review, making the ALJ's

decision the final decision of the Commissioner. (Tr. 1-5; 20 C.F.R. §416.1481.) A timely Complaint for administrative review of the ALJ's hearing decision was filed on September 27, 2011. (Tr. 12.) This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).

### III.   **Background**

Claimant was born on September 8, 1989, making him twenty years old at the issuance of the ALJ's decision. (Tr. 113.) At the time of the hearing, Claimant was 5'6" tall and weighed approximately 100 pounds. (Tr. 39.) Claimant testified that he lived in a mobile home with his mother in Rock Falls, Illinois. (Tr. 24, 113.) Claimant reported that he was not receiving money from any source, including food stamps. (Tr. 25.) Claimant also testified that he did not have a driver's license, so he is dependent on his mother for transportation. (Tr. 25.)

Claimant has a limited education; he testified that he, "did two years of seventh grade" and that once he turned sixteen he was "moved into high school." (Tr. 25, 37.) Once in high school, Claimant stated his attendance record was poor because he had trouble getting out of bed in the mornings. (Tr. 38.) He explained that when he would go to school, he would be so far behind that he could not catch up and he did not have enough energy to get around. (Tr. 38.) Claimant testified that he had difficulty focusing in school and that he would often fall asleep due to being physically drained - in part from walking from class to class in the short time between periods. (Tr. 38.) When awake in the classroom, Claimant said he had issues concentrating on what the teachers would say and would only understand "bits and pieces and not be able to retain all of the information to understand everything because [he] wouldn't be there all the time." (Tr. 39.) When asked by the ALJ why he stopped going to school, Claimant

testified that after he fell behind and could not keep his grades up, the school administrator told him that he was wasting his time. (Tr. 26.) Claimant dropped out of school shortly after that conversation. (Tr. 26.) Claimant had not obtained a GED as of the hearing date. (Tr. 26.)

Claimant has no relevant work experience, as he has never been employed. (Tr. 26.) Claimant testified that he has never been hired anywhere and he does not think he can work because he gets fatigued very easily. (Tr. 26.) When asked if he has ever applied for a job, Claimant said he has not. (Tr. 26.) Claimant also testified that he did not think he could not do a job that would not require him to stand or lift (i.e. assembly or inspection work) because he has trouble concentrating and focusing. (Tr. 26.)

The ALJ next questioned Claimant about potential discrepancies in his medical record. (Tr. 27.) Cardiologist Dr. Lynn Kutsche assessed Claimant as being disabled, whereas Dr. Hect reported that Claimant required no physical limitations. (Tr. 27.) Claimant explained that he was told that if he does anything that restricts his heart and puts pressure on his chest, he is supposed to stop doing it. (Tr. 27.) If he does anything, he feels like he will get symptoms of fatigue and will not be able to continue. (Tr. 27.) Claimant stated that he has only seen Dr. Kutsche once, and Dr. Hect twice. (Tr. 27.) He reported that he is no longer currently seeing a cardiologist because he has no insurance and cannot afford it. (Tr. 27-28.) But, in October of 2008, Claimant visited Northwestern Memorial Hospital where he was told he had a dilated root which would eventually require surgery. (Tr. 29.) The ALJ noted that the latest notes from Dr. Hect indicate that he did not recommend any surgery for the aortic root because there has been no progression; however, Claimant stated that other doctors have told him the condition had worsened and that also his root is so deformed in his heart that they could not get an accurate measurement. (Tr. 27-28.)

With regards to physical symptoms, Claimant testified that he has not been suffering from any physical pain, but that his primary problem has been fatigue. (Tr. 29.) He also complained of other physical symptoms such as nausea and softness of breath. (Tr. 29.) The ALJ then noted a report from Dr. Hect in which he reported Claimant could keep up with his peers when riding bicycles and playing basketball. (Tr. 29.) Claimant responded that he was unsure why that information was in the Dr. Hect's notes, as he never mentioned that to Dr. Hect and that he does not do either of those activities. (Tr. 29.) Claimant explained that he had talked about basketball, but never about playing the sport. (Tr. 29.) When in school, Claimant testified that he never participated in physical education classes or any organized sporting activities. (Tr. 30.) With respect to walking, Claimant stated he would be able to walk only a single block before he would absolutely need to stop. (Tr. 30.) Claimant indicated that he would not be able to stand for fifteen to twenty minutes at a time, but that he can sit and not do anything for quite a while. (Tr. 30.) However, he becomes drowsy when sitting in front of a computer after about ten minutes. (Tr. 30.) When the ALJ asked Claimant how much weight he believed he could lift, he responded that his doctors have told him not to lift more than five pounds to avoid putting pressure on his chest. (Tr. 30-31.)

Claimant testified his daily routine begins by waking up around 10:00 or 11:00 a.m. (Tr. 31.) He stated, "it's hard for me sometimes to get out of bed and wake up, but as soon as I am up, I pretty much take it easy, watch [television], eat when I want to …and pretty much try to avoid trying to do anything because when I do I get sick. I just pretty much kind of take a steady break throughout the day." (Tr. 31.) Claimant does not cook, and if he prepares a meal, he uses the

microwave. (Tr. 31.) Claimant said his mother does all of the cleaning, laundry, and household chores because when he tries to do them he feels sick and fatigued. (Tr. 31.) He also stated his mother does the grocery shopping. (Tr. 32.)

With respect to yard work, Claimant says he has tried mowing the yard before, but gets the same symptoms that make him feel sick, and that he is "not very good in the heat." (Tr. 32.) Claimant stated he does not exercise and the only thing he could consider a hobby would be listing to music. (Tr. 34.) Additionally he testified that he tries to avoid going outside of the house and tries to keep to himself, but he talks occasionally with friends. (Tr. 34-35.) Claimant estimated that he is usually only awake for about six hours a day, after which he feels "wiped out." (Tr. 35.) Despite the fact that his average night's sleep is about fourteen hours, Claimant reported that he still requires naps throughout the day. (Tr. 34-36.)

The VE, Frank Mendrick, also testified before the ALJ. (Tr. 40-44.) The VE was asked by the ALJ to provide examples of jobs that a nineteen year old hypothetical individual, with no prior work experience, and a sixth grade education could perform. (Tr. 40.) Additionally, the hypothetical individual would have the following exertional limitations:

- can sit for six to eight hours out of the day;
- can walk at least two hours out of the day;
- can lift and carry frequently less than ten pounds and occasionally up to ten pounds; and
- must avoid concentrated exposure to dust, odors, fumes and gases. (Tr. 40.)

The VE listed data from six counties in Chicago metropolitan area, plus Boone and Winnebago counties in the Rockford area. (Tr. 40.) This data included only unskilled and sedentary, general assembly jobs. (Tr. 40.) The VE stated 2,000 final assembly, 1,200 inspector, and 1,500 hand laborer jobs existed in the region. (Tr. 40-41.) The ALJ then added an additional

limitation to the hypothetical individual, which entailed that the individual could only occasionally stoop, crawl, climb, crouch and kneel. (Tr. 41.) The VE testified that the additional limitations would not effect the availability of the aforementioned positions. (Tr. 41.)

Claimant's attorney also questioned the VE. (Tr. 41-44.) The VE was asked if the hypothetical individual would be capable of sustaining employment if his impairments forced him to miss more than four days in a month. (Tr. 42.) To which the VE replied that in a factory setting, the national average is seven days missed a year and because four days a month is in far excess of the national average, the hypothetical individual would likely not be able to sustain full time employment if forced to miss four days of work a month. (Tr. 42.)

Claimant's attorney then asked the VE how many jobs would be available for a hypothetical individual of the same age and with the same education and work experience as the Claimant, if the hypothetical individual also had an RFC that limited him to not being able to walk any city blocks without rest, was only able to stand at one time for less than thirty minutes, because he is subject to becoming faint and dizzy, and would have to unexpectedly sit down. (Tr. 42.) The VE responded that no jobs in the national economy existed for that particular hypothetical individual. (Tr. 42.)

Another hypothetical was described to the VE by Claimant's attorney. (Tr. 43.) This hypothetical individual of the same age and with the same education and prior work experience of Claimant needed to take unscheduled breaks in an eight-hour work day and was recommended not to lift or carry any weight in a work environment. (Tr. 43.) The VE found that no occupations in the national economy existed for this hypothetical individual. (Tr. 43.) Finally, when asked by Claimant's attorney if people are allowed to sleep on the job, the VE indicated that sleeping on the job was not allowed. (Tr. 43.)

## IV.    Medical Evidence

Claimant underwent a surgical repair of his aortic-left ventricular tunnel on September 14, 1989, six days after his birth. (Tr. 274.) The medical record begins in August of 2001 with a letter from Dr. J.J. Shah, a pediatric cardiologist from the University of Illinois College of Medicine at Peoria, to Claimant's primary care physician Dr. Susan Provow, M.D. (Tr. 226.) Dr. Shah wrote that Claimant has "done quite well" since his prior visit in 2000. (Tr. 226.) However, Dr. Shah reported that during the examination Claimant had a high grade fever, which probably resulted from a viral illness. (Tr. 226.) Dr. Shah indicated that during Claimant's last visit he felt Claimant had an irregular [heart] rhythm with multiple premature atrial complexes[1], but during the current visit the doctor found Claimant's pulses to be regular. (Tr. 226.) Claimant's precordium[2] was mildly active with a left ventricle impulse, with a prominent pectus[3].  (Tr. 226.) Dr. Shah also explained the results of an echocardiogram[4] performed on Claimant. (Tr. 226.) The echocardiogram demonstrated a dilated aortic root[5], measuring about four centimeters in size. (Tr. 226.) There was no evidence of outflow from the left ventricle, but there was a mild aortic regurgitation[6] with abnormal aortic valve. (Tr. 226.) The left ventrical architecture appeared to

---

[1] Premature Atrial Complexes (PAC's) are early beat that disrupts the heart's rhythm, usually followed by a pause that causes the next beat to be more forceful. PAC's are common and occur more regularly in children and teenagers. Heart.org, http://www.heart.org/HEARTORG/Conditions/Arrhythmia/AboutArrhythmia/Premature-Contractions_UCM_302043_Article.jsp

[2] Precordium is the part of the ventral surface of the body overlying the heart and stomach and comprising the epigastrium and the lower median part of the thorax. Merriam-websters.com, http://www.merriam-webster.com/medical/precordium.

[3] Pectus excavatum is a condition in which a person's breastbone is sunken into his or her chest. The chest bows inward instead of outward.

[4] An echocardiogram is a test that uses sound waves to create a moving picture of the heart. The picture is much more detailed than a plain x-ray image and involves no radiation exposure. National Library of Medicine, National Institutes of Heatlh, http://www.nlm.nih.gov/medlineplus/ency/article/003869.htm

[5] Dilation of the aortic root is when a segment of the aorta closest to the heart is enlarged.  This is a serious problem and common for people with Marfan's syndrome. Marfan's.org, http://www.Marfan's.org/Marfan's/2760/Aortic-Surgery

[6] A term used to refer to 'leakage' at a heart valve, the flow of blood backwards through a valve, which should be closed, is referred to as 'regurgitation' or 'incompetence'

be somewhat abnormal, and thicker than usual. (Tr. 226.) However, when compared to previous echocardiograms, Dr. Shah did not feel there was significant change. (Tr. 226.) Claimant's lungs were clear and liver and spleen were not palpable. (Tr. 226.) In sum, Dr. Shah impressions were:

- aortic root dilatation;
- mild aortic regurgitation;
- previous history of left ventricle to aortic tunnel; and
- Claimant's fever was likely the result of a viral illness.(Tr. 226.)

Dr. Shah recommended Claimant return to the clinic for a visit in one year, take endocarditis prophylaxis[7] whenever indicated, and that Claimant "may participate in normal usual activities as tolerated." (Tr. 226.)

A diagnostic imaging report dated September 10, 2002, conducted by Dr. Krishna Chadalavada, noted "Cardiomegaly[8] with abnormal cardiac configuration. No active pulmonary infiltrates or pleural effusion or pneumothorax. Sternotomy sutures are seen." (Tr. 229.) Dr. Chadalavada's impressions were:

- Abnormal cardiac configuration compatible with congenital heart disease;
- Echocardiography may be obtained for further assessment if indicated; and
- No active pulmonary infiltrates were seen. (Tr. 229.)

On September 11, 2002, Claimant again visited Dr. Shah. (Tr. 225.) At the time, Claimant was thirteen years old. (Tr. 225.) Claimant was listed at fifty-three inches tall and weighed fifty-nine pounds. (Tr. 225.) Dr. Shah noted Claimant was "feeling good" and was "doing well." (Tr. 212.) He also indicated that Claimant's precordium was again active with a

---

[7] Use of antibiotics to prevent inflammation of the inside lining of the heart chambers and heart valves (endocardium),at times when bacteria may be expected to enter the bloodstream (e.g. dental extractions or surgery on nose, throat, mouth or bowel). RCH.org, http://www.rch.org.au/cardiology/parent_info/Glossary/#E

[8] [8]The term "cardiomegaly" most commonly refers to an enlarged heart seen on chest X-ray before other tests are performed to diagnose the specific condition causing your cardiomegaly. Mayoclinic.com, http://www.mayoclinic.com/health/enlarged-heart/ds01129

left ventricle impulse. (Tr. 225.) A moderately severe pectus excavatum was noted. (Tr. 225.) On

auscultation[9], Claimant's first and second heart sounds were normal, with a prominent systolic

click noted at the left upper and lower sternal border. (Tr. 225.) This was also noted in

Claimant's August, 2001, visit with Dr. Shah. (Tr. 225.) Dr. Shah reported a grade II/IV systolic

ejection murmur[10] present at the left upper sternal border, as well as the middle sternal border.

(Tr. 225.) No diastolic murmur was appreciated and Claimant's liver and spleen were not

enlarged. (Tr. 225.) No echocardiogram was performed during this visit. (Tr. 225.) Dr. Shah's

impression was a dilated aortic root, without significant aortic regurgitation. (Tr. 225.) Dr. Shah

recommended:

- continued following of Claimant, with some restriction of physical activity, including "no participation in any competitive sports or weight lifting, etc.";
- periodic echocardiograms, with the possibility of a future replacement of Claimant's aortic root;
- treatment as if Claimant has Marfan's syndrome, although he does not have Marfan's syndrome, as far as his aortic root dilatation was concerned;
- endocarditis prophylaxis whenever required; and
- a follow up visit in one year during which an echocardiogram would be performed. (Tr. 225.)

Claimant was examined by cardiologist, Dr. Ernesto S. Rivera, M.D., on October 15,

2003. (Tr. 223-24.) Dr. Rivera noted that Claimant and his mother stated Claimant was "doing

well." (Tr. 223.) Claimant reported migraines, for which he was taking Zomig[11] and that he had

---

[9] Auscultation is the method of listening to the sounds of the body during a physical examination. Auscultation is usually done using a tool called a stethoscope. http://www.nlm.nih.gov/medlineplus/ency/article/002226.htm

[10] S*ystolic ejection murmurs* (SEM, crescendo-decrescendo) result from turbulent blood flow across the aortic and pulmonary valves. Blood flow across these valves starts after adequate pressure has built up in the ventricle to overcome the pressure in the aorta or pulmonary artery. Systolic heart murmurs are graded on a six point scale from I/VI (being very faint) to VI/VI (being loud enough to be heard without the use of a stethoscope.) Claimant's score of II/IV equaled faint but easily audible. utmb.com, http://www.utmb.edu/pedi_ed/CORE/Cardiology/page_03.htm

[11] Zomig (zolmitriptan) is a headache medicine that narrows blood vessels around the brain. Zomig will only treat a headache that has already begun. It will not prevent headaches or reduce the number of attacks. Drugs.com, http://www.drugs.com/zomig.html

ADD for which he was taking Strattera[12] at bedtime. (Tr. 223.) Claimant stated he was

comfortable, not in any distress, and was not experiencing chest pain, palpitation, syncope,

shortness of breath, or easy fatigability. (Tr. 223.) Dr. Rivera reported following on examination:

- Claimant's chest was clear to auscultation;
- Claimant had significant pectus excavatum;
- Claimant's first heart sound was normal and the second heart sound was loud, single, and prominent;
- Claimant had a grade II/VI systolic ejection murmur at his left midsternal border;
- Claimant's suprasternal notch is pulsatile;
- no gallop, rub, or diastolic murmur; and
- Claimant's pulses were full without brachio-femoral delay;
- dilation of the ascending aorta; and
- aortic valve annulus dilation. (Tr. 223.)

Following an ECG, Dr. Rivera's impression was:

- Claimant's aortic valve morphology appeared to be abnormal;
- Claimant had mild left ventricular outflow tract obstruction without significant gradient;
- Claimant had high cervical arch that appeared to be patent. There is questionable echogenic density in the descending aorta; and
- paradoxical motion of the septal wall. (Tr. 224.)

Dr. Rivera's recommended that Claimant undergo a transesophageal echo[13] ("TEE") to outline

aortic valve morphology better. (Tr. 224.) Also that Claimant would require lifelong endocarditis

---

[12] Strattera (atomoxetine) affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Drugs.com, http://www.drugs.com/strattera.html.

[13] TEE is a type of echocardiography (echo). Echo shows the size and shape of the heart and how well the heart chambers and valves are working. Echo can pinpoint areas of heart muscle that aren't contracting well because of poor blood flow or injury from a previous heart attack. National Heart, Lung, and Blood Institute, nhlbi.nih.gov, http://www.nhlbi.nih.gov/health/health-topics/topics/tee/

prophylaxis for dental and invasive procedures. (Tr. 224.) Dr. Rivera also restricted Claimant's activity pending the TEE. (Tr. 225.) Pending normal TEE results, Dr. Rivera requested Claimant return in one year. (Tr. 225.)

On October 30, 2003, Dr. Rivera wrote a follow up letter to Dr. Provow. (Tr. 222.) Dr. Rivera's recommendation following an echocardiogram performed on October 27, 2003, was that Claimant be started on Atenolol 12.5 mg twice a day to prevent further dilatation of the ascending aorta and that Claimant return in eight months to monitor his response to the medication. (Tr. 222.) Also, Dr. Rivera noted Claimant would require endocarditis prophylaxis for dental procedures and invasive procedures. (Tr. 222.) Dr. Rivera found no aortic dissection. (Tr. 222.) He did note dilatation of the aortic sinuses and ascending aorta. (Tr. 222.) Additionally, he suggested that Claimant's strict physical activity restrictions should be lifted; however, Claimant should refrain from contact sports and "power lifting," due to his enlarged ascending aorta. (Tr. 222.)

In March of 2004, Dr. Shah noted Claimant reported "having a lot of headaches." (Tr. 208.) As for physical restrictions, Dr. Shah only recommended Claimant avoid "power lifting." (Tr. 220.) In September of 2004, Dr. Shah reported that Claimant was "doing good except for bad headaches [that] can last up to thirty days". (Tr. 220.) Dr. Shah noted that a TEE showed a very dysplastic aortic valve with mild central aortic insufficient, and there was also significant dilation of the aortic sinus and ascending aorta. (Tr. 220.) Claimant did not report that he was experiencing any chest pains, shortness of breath, or easy fatigability. (Tr. 220.) Dr. Shah recommended that Claimant remain on 25 mg of Atenolol a day. (Tr. 220.) Dr. Shah stated no specific restrictions, other that very strenuous physical activities and "power lifting". (Tr. 220.)

Following a physical examination of Claimant, in March of 2005, Dr. Shah explained to Claimant that due to aortic root dilation, Claimant was restricted from lifting heavy weights as it could cause stress on his already dilated aortic root. (Tr. 217.) Dr. Shah's notes from March of 2005 indicate that Claimant was "doing good", but had stopped taking Strattera[14] because it "made [him] too sleepy." (Tr. 206.) Claimant remained on 25 mg of Atenolol a day. (Tr. 215.) Dr. Shah opined that Atenolol should help to decrease the rate of progression of the dilatation. (Tr. 217.)

Six months later, in September of 2005, Claimant visited Dr. Shah for a follow up evaluation. (Tr. 214.) Dr. Shah reported that, since last seen, Claimant stated he was "doing much better". (Tr. 214.) Claimant stated that after being started on Atenolol in March, he felt his "heart is beating better". (Tr. 214.) Claimant denied "any easy fatigability, dyspnea, or tachypnea or prolonged fevers". (Tr. 214.) An echocardiogram showed Claimant's aortic root was dilated measuring 4.3 cm in diameter, which represented a mild increase as it was 4 cm in March of 2005. (Tr. 214.) The echocardiogram also indicated mild aortic insufficiency. (Tr. 214.) Dr. Shah recommended that Claimant, because of his aortic root dilation, refrain from "engaging in any strenuous physical activity and from heavy weightlifting". (Tr. 215.) Dr. Shah increased Claimant to 37.5 mg of Atenolol daily, but due to subsequent adverse reactions, Claimant was instructed to go back to 25 mg of Atenolol daily. (Tr. 215.)

---

[14] Strattera (atomoxetine) affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Strattera is used to treat attention deficit hyperactivity disorder (ADHD). Drugs.com, http://www.drugs.com/strattera.html

Roughly six months following Claimant's visit with Dr. Shah, Claimant was evaluated by cardiologist, Dr. Bruce M. Hect, M.D., of the Pediatric Cardiology Clinic of Illinois. (Tr. 200-01.) In a letter to Dr. Provow, dated March 21, 2006, Dr. Hect indicated that Claimant was normally active and generally healthy without symptoms referable to his cardiovascular system. (Tr. 200.) At the time of this evaluation, Claimant was still on 25 mg of Atenolol daily, and reported experiencing migraine headaches. (Tr. 200.) Dr. Hect stated Claimant "[had] no other symptom[s] suggesting Marfan's syndrome." (Tr. 200.) Claimant was also reported to be able to "keep with grade nine peers in routine activities but [was] excused from gym class." (Tr. 200.) Dr. Hect wrote that Claimant may in fact have a Marfan's syndrome variant, as well as conduction system abnormality representing a long QT interval syndrome[15]." (Tr. 200-01.) Dr. Hect's also wrote that Claimant has a dilated aortic root measuring 40 mm (4 cm). (Tr. 200.) For those reasons, Dr. Hect recommended increasing Claimant's Atenolol dosage to 37.5 mg a day, and requested that Claimant return for a reassessment in six months. (Tr. 200-01.)

During the follow up visit with Dr. Hect in September of 2006, Claimant's general exam was normal. (Tr. 197.) Dr. Hect reported that an echocardiogram performed during the March evaluation revealed unusual "spongy" myocardial appearance. (Tr. 197.) Dr. Hect indicated that Claimant "[had] been as physically active as he [wanted] to be since [the last visit] with no exercise induced cough." (Tr. 197.) Dr. Hect wrote that he was "concerned we are approaching a point where intervention may be necessary" due to the fact that Claimant's aortic root dilation increased to 49-50 mm (5 cm). (Tr. 197.) However, he noted that Claimant need not be

---

[15] Long QT syndrome (LQTS) is a heart rhythm disorder that can potentially cause fast, chaotic heartbeats. These rapid heartbeats may trigger a sudden fainting spell or seizure. In some cases, your heart may beat erratically for so long that it can cause sudden death. Mayoclinic.com, http://www.mayoclinic.com/health/long-qt-syndrome/DS00434

restricted in any way in his physical activities, and requested that Claimant return in six months time. (Tr. 197.) An echocardiogram report dated September 8, 2006, diagnosed a dilated aortic root. (Tr. 198.)

After Claimant's follow up visit with Dr. Hect in April of 2007, Dr. Hect reported that since his evaluation of Claimant six months prior, Claimant has remained normally active "for him," but he was restricted from participating in gym class. (Tr. 195.) Dr. Hect stated Claimant was "able to keep up [with] peers riding bicycles and during informal basketball games." (Tr. 195.) Dr. Hect noted that Claimant's aortic root dimension was only about 40-42 mm (4 cm). (Tr. 195.) While Dr. Hect had anticipated surgical repair during Claimant's last visit, he retreated from that impression and added that he was now more comfortable that there has not been important progression in Claimant's condition; and therefore, consented to stretch out the time between visits to one year. (Tr. 195.) Dr. Hect also prescribed Claimant with an Albuteral inhaler for his current cough. (Tr. 195.)

On April 25, 2008, Claimant was evaluated by cardiologist, Dr. Lynn Kutsche, M.D., in Rockford. (Tr. 241.) At the time of the visit, Claimant was eighteen years old. (Tr. 241.) Dr. Kutsche indicated in a letter to Dr. Provow that Claimant reported tiring easily. (Tr. 241.) However, Claimant was reported to be in "better shape than he was last year" and stated that he worked out. (Tr. 241.) At the time of this visit, Claimant was not on any medication. (Tr. 241.) Dr. Kutsche wrote, "although [Claimant] does not require restriction of his physical activities, [Claimant] should stop when he becomes tired or has any other symptoms." (Tr. 242.)

Approximately one month later, on May 21, 2008, Claimant was personally examined by Dr. Phillip S. Budzenski, MD. (Tr. 243.) The DDS consultative examination showed that Claimant was sixty-four inches tall and weighed 102 pounds. (Tr. 244.) Dr. Budzenski described

Claimant as underweight in appearance. (Tr. 247.) Dr. Budzenski's examination of Claimant's chest revealed pectus excavatum deformity and pulsatile aorta behind the sternoclavicular notch. (Tr. 243-47.) Dr. Budzenski also noted a 'huge' cardiomegaly with the heart palpable to below the left ribcage. (Tr. 243-47.) The remainder of the examination was largely normal, and Dr. Budzenski deferred to Claimant's cardiologist for work restrictions and limitations. (Tr. 247.) It was also noted that Claimant reported he was allowed to do sedentary work[16]. (Tr. 247.)

In June of 2008, a physical residual functional capacity assessment was conducted by non-examining DDS physician, Dr. Frank Jimenez. (Tr. 248- 55.) Dr. Jimenez found that Claimant

- could occasionally lift and/or carry (including upward pulling) ten pounds;

- could frequently lift and/or carry (including upward pulling) less than ten pounds;

- could stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday;

- could sit (with normal breaks) for a total of about six hours in an eight-hour workday;

- could push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry category;

- had no postural, manipulative, visual, or communicative limitations; and

---

[16] (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567

- should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation;

According to Dr. Jimenez's report, Claimant's activities of daily living included driving, but only five to ten miles at a time, because driving tired Claimant. (Tr. 255.) Also, Dr. Jimenez reported that Claimant fatigued with all activity, to the point where Claimant could not walk two blocks without getting shortness of breath. (Tr. 255.) Dr. Jimenez indicated that Claimant's statements regarding his shortness of breath and fatigability were credible. (Tr. 255.)

Later, in October of 2008, a Residual Functional Capacity Questionnaire was completed by Dr. Kutsche. (Tr. 259-64.) Dr. Kutsche's diagnosis of Claimant included Marfan's syndrome, abnormal ascending aorta, prolapse of mitral valve, and abnormal left ventrical function. (Tr. 259.) The symptoms Dr. Kutsche listed that were experienced by Claimant were; shortness of breath, fatigue, palpitations, and sweatiness. (Tr. 259.) Although Dr. Kutsche indicated that Claimant would be incapable of tolerating even "low stress" jobs, according to Dr. Kutsche Claimant's symptoms were not induced by stress. (Tr. 260.) Dr. Kutsche indicated that Claimant was not a malingerer. (Tr. 260.) He further indicated that Claimant's physical symptoms and limitations caused emotional difficulties such as depression or chronic anxiety, noting that "limitations in young people can often result in depression." (Tr. 260.) Dr. Kutsche indicated that Claimant's cardiac symptoms were frequently to constantly severe enough to interfere with attention and concentration. (Tr. 261.) When placed in a competitive work situation, Dr. Kutsche estimated that Claimant

- would not be able to walk any city blocks without rest;
- could sit, but would have problems doing activities while sitting;
- would only be able to stand for less than thirty minutes, before getting faint and dizzy;
- would require unscheduled breaks though out an eight-hour workday and that she did not recommend standing;

- should never lift or carry any weight;
- should never climb ladders or stairs;
- should avoid all exposure to extreme heat and cold, fumes, odors, dusts, gases, poor ventilation, and hazardous machinery; and
- experiences good days and bad days which would result in, on average, Claimant missing more than four days per month. (Tr. 262-64.)

## V.    Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).  However, the Court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]."  *Id.*  The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the ALJ and this Court cannot substitute its own opinion or findings in place of the ALJ.  *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion."  *Binion*, 108 F.3d at 782.  If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the

ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner normally proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.

## VII.    Analysis

### A.    Step One: Is Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Due to the fact that Claimant has never been employed, the ALJ properly found that Claimant has not been engaged in substantial gainful activity at anytime relevant to her decision. (Tr. 53.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.    Step Two: Does Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404 1520 (a)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520 (c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. *Id*. If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends. *Id.*

Here, the ALJ noted that Claimant has the following severe impairments: Marfan's syndromes, left ventricular tunnel malformation, and aortic insufficiency. (Tr. 53.) The ALJ found that the above impairments are severe enough to cause significant limitations in the

Claimant's ability to perform basic work activities. (Tr. 53.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

**C.      Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing significant gainful activity. 20 C.F.R. § 404.1525 (a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis, the ALJ found that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 53.) With respect to Listing 4.06, the listing requires the presence of a cyanosis[17] at rest. (Tr. 53; 20 C.F.R. § 404app. 1.)  The record is absent any findings that Claimant experienced cyanosis at rest, and therefore the ALJ's conclusion that Claimant fails to meet or equal listing 4.06 is affirmed. (Tr. 53.)

However, Claimant argues that the ALJ's analysis of Listing 4.10 was improper. (Pl. Brief 7-10.) In her decision, the ALJ indicated that Listing 4.10 requires the presence of an aneurysm, and because the record lacked evidence indicating the existence of an aneurysm,

---

[17] Cyanosis is a bluish color to the skin or mucus membranes that is usually due to a lack of oxygen in the blood. nlm.nih.gov, http://www.nlm.nih.gov/medlineplus/ency/article/003215.htm.

Claimant did not meet or medically equal the requirements of Listing 4.10. (Tr. 53.) In support of

his argument, Claimant alleges that the ALJ ignored, and that her decision was irreconcilably

inconsistent with, the plain language of the listing. (Pl. Brief. 9.) Listing 4.10 reads as follows:

> **4.10    Aneurysm of aorta or major branches,** due to any cause
> (e.g., atherosclerosis, cystic medial necrosis, Marfan's syndrome,
> trauma), demonstrated by appropriate medically acceptable
> imaging, with dissection not controlled by prescribed treatment
> (see 4.00H6).

The introduction to the cardiac listings appreciates the link between Marfan's syndrome

and cardiac problems:

> a. Marfan's syndrome is a genetic connective tissue disorder that
> affects multiple body systems, including the skeleton, eyes, heart,
> blood vessels, nervous system, skin, and lungs. There is no specific
> laboratory test to diagnose Marfan's syndrome. The diagnosis is
> generally made by medical history, including family history,
> physical examination, including an evaluation of the ratio of
> arm/leg size to trunk size, a slit lamp eye examination, and a heart
> test(s), such as an echocardiogram. In some cases, a genetic
> analysis may be useful, but such analyses may not provide any
> additional helpful information.
>
> b. The effects of Marfan's syndrome can range from mild to
> severe. In most cases, the disorder progresses as you age. Most
> individuals with Marfan's syndrome have abnormalities associated
> with the heart and blood vessels. Your heart's mitral valve may
> leak, causing a heart murmur. Small leaks may not cause
> symptoms, but larger ones may cause shortness of breath, fatigue,
> and palpitations. Another effect is that the wall of the aorta may be
> weakened and abnormally stretch (aortic dilation). This aortic
> dilation may tear, dissect, or rupture, causing serious heart
> problems or sometimes sudden death. We will evaluate the
> manifestations of your Marfan's syndrome under the appropriate
> body system criteria, such as 4.10, or if necessary, consider the
> functional limitations imposed by your impairment.

In his brief, Claimant cites the regulations which state that a claimant is eligible for benefits if his impairments, or combination of impairments, meets or equals an impairment found in the Listing of Impairments. See 20 C.F.R. §§ 404.1520(d), 416.920 (d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations go on to explain that an equivalence will be found when "the medical findings are at least equal in severity and duration to the listed findings." 20 C.F.R. §§ 404.1526(s), 416.926(s).

Claimant argues that a dilated aorta is the equivalent to an aneurysm, and therefore, the ALJ should have found that Claimant met Listing 4.10. Indeed, Claimant's medical record contains numerous reports that Claimant's aorta measured up to four centimeters. (Tr. 195-198, 200, 202, 214-217, 225.). These reports are relevant because in the medical community, "any permanently dilated section [of the aorta] measuring 4.0 cm or greater in diameter has been called an aneurysm." [18] Additionally, "whether the aorta is called 'dilated' or the word 'aneurysm' is used, any enlargement of the aorta, regardless of its size, is an indication of aortic disease and requires treatment." [19] Therefore, even though Claimant's medical records never mention the presence of an aortic "aneurysm," the abundance of reports indicating aortic dilation easily makes Claimant a potential candidate for Listing 4.10. Furthermore, those reports indicating Claimant's aortic dilation show the ALJ misunderstood the language in the listing, and that her overly-broad statement during the hearing that, "there must be an aneurysm of which there's not a showing of an aneurysm either. So I don't see how either of those listing apply in this case" was erroneous. (Tr. 24.)

---

[18] http://www.cedars-sinai.edu/Patients/Programs-and-Services/Heart-Institute/Conditions/Aortic-Disease.aspx#top
[19] cedars-sinai.edu, http://www.cedars-sinai.edu/Patients/Programs-and-Services/Heart-Institute/Conditions/Aortic-Disease.aspx#top

Nevertheless, while Claimant was correct in that aspect of his argument, he failed to take into consideration the *entire* language of Listing 4.10, specifically the conclusion, "with dissection not controlled by prescribed treatment." 20 C.F.R. § 404 app. 1. After this Court's thorough review of the entire record, it finds there is no substantial evidence which indicates Claimant had experienced any aortic dissection. As a matter of fact, in October of 2003, Dr. Ernesto Rivera, after conducting a TEE, opined that "[t]here is no aortic dissection." (Tr. 222.) Dr. Rivera's report indicating no aortic dissection, and the absence of aortic dissection diagnosis from Claimant's other doctors equates to substantial supportive evidence that Claimant has not experienced aortic dissection, and as a result does not meet the requirements of Listing 4.10. Claimant's argument is not well-taken. For the foregoing reasons, the ALJ's decision at Step Three is affirmed.

**D.      Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

In performing the analysis for Step Four, the ALJ determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairments. 20 C.F.R. § 404.1545 (a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527 (e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

At Step Four the ALJ found Claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967 (a), except: he can lift and/or carry ten pounds occasionally and lesser weights frequently; he can stand and/or walk for at lest two hours in an eight-hour workday; he can sit for six to eight hours in an eight-hour workday; he can occasionally stoop, crawl, climb, crouch and kneel; and he must avoid concentrated exposure to pulmonary irritants. (Tr. 53.)

Claimant argues that the ALJ's residual functional capacity determination was not supported by substantial evidence. Specifically, "the ALJ disregarded a substantial amount of medical evidence demonstrating a disabling condition, most notably the opinion of treating cardiologist Dr. Lynne Kutsche." (Pl. Brief 10.) Moreover, Claimant argues that because Dr. Kutsche was a cardiologist that had treated Claimant for a number of years, the ALJ inappropriately afforded her opinion little weight in favor of non-treating, non-examining state-agency physicians. (Pl. Brief 10.)

A "physician's opinion regarding the nature and severity of an impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case." *Shramek v. Apfel*, 226 F.3d 809, 814. Claimant argues there is an abundance of medical evidence that suggests he is completely disabled. However, the only report indicating that Claimant is disabled is Dr. Kutsche's October 2008 Cardiac Residual Functional Capacity Questionnaire ("questionnaire"). (Tr. 259-64.) While the Court finds that Dr. Kutsche's questionnaire is extremely limiting regarding Claimant's ability to work, it is also inconsistent with the overall medical evidence of record, including Dr. Kutsche's own reports from May of the same year. (Tr. 259-64, 241-42.)

The ALJ noted this inconsistency in her opinion, stating Dr. Kutsche's reports from May of 2008 and other cardiology treatment notes in the record indicate that no physical restrictions on the Claimant were necessary. (Tr. 56-57.) She continued, "[Dr. Kutsche's] own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." (Tr. 57.) Further, aside from Dr. Kutsche's questionnaire itself, there is no evidence in the record to show that Claimant's condition had worsened between May and October 2008.

The ALJ spends a great deal of time in her written opinion summarizing Claimant's testimony and medical history as it relates to Step Four. (Tr. 53-57.) However, the ALJ does not appear to articulate a direct connection between her specific RFC limitations and the medical record. Despite this error, "[n]o principle of administrative law or common sense requires [the Court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989); *People of the State of Illinois v. I.C.C.,* 722 F.2d 1341, 1348 (7th Cir. 1983) (Posner, J.) ("But if we are sure that the agency would if we remanded the case reinstate its decision . . . a reversal would be futile[.]"); *See also Pawlowski v. Astrue*, 800 F.Supp.2d 958, 967 (7th Cir. 2011). Upon careful review, the Court finds that here is substantial evidence in the record to support the ALJ's RFC findings:

- In 2003, Dr. Rivera opined that any of Claimant's strict physical activity restrictions should be lifted; however, Claimant should refrain from contact sports and "power lifting." (Tr. 222.)

- In 2004, Dr. Shah only recommended Claimant avoid "power lifting" and Claimant did not report that he was experiencing any chest pains, shortness of breath, or easy fatigability. (Tr. 220.)

- In September 2005, Dr. Shah reported that Claimant was "doing much better" and Claimant denied "any easy fatigability, dyspnea, or tachypnea or prolonged fevers". (Tr. 214.) Dr. Shah recommended that Claimant only refrain from "engaging in any strenuous physical activity and from heavy weightlifting". (Tr. 215.)

- In a letter to Dr. Provow, dated March 21, 2006, Dr. Hect indicated that Claimant was normally active and generally healthy without symptoms referable to his cardiovascular system. (Tr. 200.) Claimant was also reported to be able to "keep with grade nine peers in routine activities but [was] excused from gym class." (Tr. 200.)

- In September 2006, Dr. Hect indicated that Claimant "[had] been as physically active as he [wanted] to be since [the last visit] with no exercise induced cough." (Tr. 197.) But, "Claimant need not be restricted in any way in his physical activities." (Tr. 197.)

- In early 2007, Dr. Hect reported that Claimant had remained relatively active but was still restricted from participating in gym class although he was "able to keep up [with] peers riding bicycles and during informal basketball games." (Tr. 195.)

- In May 2008, Dr. Kutsche reported that Claimant appeared to be in better shape than he was in 2007 and Claimant stated that he began working out. (Tr. 241.) Dr. Kutsche also wrote, "although [Claimant] does not require restriction of his physical activities, [Claimant] should stop when he becomes tired or has any other symptoms." (Tr. 242.)

- DDS consultant Dr. Jimanez found that Claimant could occasionally lift and/or carry ten pounds; could stand and/or walk  for a total of at least two hours; could sit for a total of about six hours; had no postural, manipulative, visual, or communicative limitations; and that Claimant should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation.

- Also in June of that year, the DDS physician, Dr. Budzenski, noted that he would "defer to [Claimant's] cardiologist" in regard to workplace restrictions (Tr. 247.) At that time, Claimant reported that he was "allowed to do sedentary work." (Tr. 247.)

Claimant also takes issue with the ALJ's credibility finding, arguing that it is "cursory and not sufficient." However, "[a]n ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.

2001). The ALJ is required to articulate the findings upon which the credibility assessment is based in order to afford meaningful review. *See Herron v. Shalala*, 19 F.3d 329, 333-4 (7th Cir. 1994).

Though it is certain that Claimant does not agree with the ALJ's analysis, Claimant has not shown how the ALJ's credibility determination was "patently wrong." The ALJ provided sufficient support for her finding that Claimant was not credible regarding his limitations. Though perhaps not perfect, her determination is far from "cursory." In fact, her opinion is peppered with support, identifying key inconsistencies between the record and Claimant's testimony, including but not limited to the following:

- Since his application, Claimant's medical treatment was relatively conservative. (Tr. 56-57.)

- In 2008, Dr. Kutsche noted that Claimant was in better shape than he was a year before. (Tr. 55, 241.)

- Although Claimant asserted that fatigue was his primary problem, there was no mention of fatigue in Dr. Hect's 2007 evaluation. (Tr. 29, 57, 195.)

- Claimant denied exercising when several physicians' notes indicate that he was active, riding a bike, playing basketball, and working out. (Tr. 29, 54.)

- Claimant reported to Dr. Budzenski that he would be able to do sedentary work. (Tr. 55, 247.)

Therefore, the Court finds that the ALJ's credibility finding is sufficient.

Finally, at the heart of Step Four is the question of whether Claimant can perform work that he has performed in the past. "Transferability of job skills is not an issue [here] because [Claimant] does not have past relevant work," the ALJ reasoned. (Tr. 57.) Neither party disagrees with this assessment and the Court affirms the ALJ's Step-Four determination.

**E.     Step Five: Is Claimant is capable of performing work existing in substantial numbers in the national economy?**

At Step Five, the Commissioner must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled.

Here, based upon the VE's testimony at hearing, the ALJ found that Claimant "is capable of making a successful adjustment to work that exists in significant numbers in the national economy," such as: assembly (2,000 jobs), inspection (1,2000 jobs), and hand laborer (1,500 jobs.) (Tr. 58.) Neither party disputes this finding. Therefore, the Court affirms the ALJ's Step-Five determination.

## VIII.  Conclusion

It is clear that Claimant has had a very serious medical condition since his birth. If the Magistrate Judge had been in the ALJ's position, he may have granted Claimant benefits. However, for the reasons provided throughout this opinion and order, the Court finds that the ALJ's decision is supported by substantial evidence. Claimant's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted.

**ENTER:**

_____
**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE:  September 4, 2013**